247 P.3d 845 (2011)
2011 WY 14
Michelle KENYON, Appellant (Petitioner),
v.
STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).
No. S-10-0091.
Supreme Court of Wyoming.
February 2, 2011.
*847 Representing Appellant: Donna D. Domonkos, Cheyenne, Wyoming.
Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General.
Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.
KITE, Chief Justice.
[¶ 1] Michelle Kenyon sought worker's compensation benefits for arthroscopic right knee surgery necessitated by a work-related injury and for a subsequent total knee replacement. After a contested case hearing, the Office of Administrative Hearings (OAH) awarded benefits for the arthroscopic surgery and related treatment but denied benefits for the total knee replacement, ruling that she did not satisfy her burden of proving that her work related injury necessitated that procedure. Ms. Kenyon petitioned for judicial review and the district court affirmed the OAH decision. Ms. Kenyon appealed to this Court claiming the OAH failed to apply the second compensable injury rule and its associated burden of proof, improperly found the Wyoming Worker's Compensation Division's (Division) expert was more persuasive than her treating physician and improperly determined that she was not credible. We affirm.

ISSUE
[¶ 2] Ms. Kenyon presents the following issue for this Court's consideration:
Whether the Office of Administrative Hearing's Findings of Fact and Conclusions of Law are in accordance with the law.

FACTS
[¶ 3] Ms. Kenyon has a long history of right knee problems. After she injured her right knee in a non-work related accident, Dr. Peter Rork, M.D., performed surgery in 1999, which included anterior cruciate ligament (ACL) reconstruction, partial lateral meniscectomy and debridement of loose cartilage. Because she continued to experience pain, Dr. Rork performed a second surgery in 2000. X-rays taken in the summer of 2000 showed osteoarthritic changes in the right knee, and Dr. Rork instructed her to use a brace.
[¶ 4] On March 19, 2006, Ms. Kenyon injured her right knee while working for Franks Westates near Pinedale, Wyoming. She was working in the oilfield on a casing crew when she caught her foot under a vent. *848 In the process of trying to free her foot, she twisted her right knee. She again sought medical treatment from Dr. Rork, and he operated on her knee on March 29, 2006. This time, he performed a partial lateral meniscectomy, debridement of loose cartilage, and three compartment synovectomy. Tests conducted at that time also showed osteoarthritic degenerative changes.
[¶ 5] Ms. Kenyon saw Dr. Rork for follow up treatment through May 2, 2006. His notes from that appointment indicated that she had good days and bad days but continued to improve. He instructed her to continue physical therapy and remain off work. Although he expected to see her for more follow up appointments, she did not return for approximately eighteen months.
[¶ 6] Ms. Kenyon filed a report of injury on April 20, 2006. She indicated in her report that she had previously injured and undergone surgery on her right knee. On May 16, 2006, the Division issued a final determination, denying benefits because her report of injury had not been filed in a timely fashion and the Division had not received copies of the medical records from her preexisting injury. Ms. Kenyon objected to the final determination and requested a hearing.[1]
[¶ 7] When Ms. Kenyon finally saw Dr. Rork again in November 2007, she reported that she was experiencing increasing discomfort in her right knee. The radiological evaluations showed "significant osteoarthritic changes" in Ms. Kenyon's knee. Dr. Rork stated in his notes that he believed Ms. Kenyon would eventually need a total knee arthroplasty (total knee replacement). With regard to the cause of the potential total knee replacement, Dr. Rork stated:
She had knee arthroscopy and debridement on March 29 and never really bounced back from that. I believe that I am not able to say with confidence that she would have ended up at this point without the work-related injury, but I am able to say with confidence that she is here because of the work-related injury. She will need a total knee arthroplasty. She has a hearing with worker's compensation and we will contact her attorney at her request concerning the same.
Dr. Rork performed a total knee replacement on July 9, 2008. Ms. Kenyon requested workers' compensation benefits for that procedure as well as for the March 2006 surgery, and the Division maintained she was not entitled to benefits for either procedure.
[¶ 8] At the contested case hearing held on December 3, 2008, Ms. Kenyon testified and presented the deposition testimony of Dr. Rork. The Division submitted a report prepared by Paul Ruttle, M.D., who had performed an orthopedic medical evaluation of Ms. Kenyon and reviewed her medical records. The OAH left the evidence open at the conclusion of the hearing because Dr. Ruttle was scheduled to be deposed later. The hearing was reconvened on February 11, 2009, at which time Dr. Ruttle's deposition transcript and Dr. Rork's written response to Dr. Ruttle's testimony were admitted into evidence.
[¶ 9] The OAH issued a decision in which it awarded benefits for the "acute" injury and associated surgery in March 2006, but denied benefits for the total knee replacement in July 2008, concluding that procedure was not related to the work injury. Ms. Kenyon petitioned the district court for review, and it affirmed the OAH decision. She then appealed to this Court.

STANDARD OF REVIEW
[¶ 10] On appeal from a district court's review of an administrative agency's decision, we review the case as if it had come directly from the agency and do not give any deference to the district court's decision. Dutcher v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2010 WY 10, ¶ 9, 223 P.3d 559, 561 (Wyo.2010); Dale v. S & S Builders, LLC, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008). Our review is governed by Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2009):
(c) To the extent necessary to make a decision and when presented, the reviewing *849 court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
(i) Compel agency action unlawfully withheld or unreasonably delayed; and
(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
[¶ 11] In accordance with § 16-3-114(c), we review the agency's findings of fact by applying the substantial evidence standard. Dale, ¶ 22, 188 P.3d at 561. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Bush v. State ex rel. Wyo. Workers' Comp. Div., 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo.2005) (citations omitted). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." Id.
[¶ 12] With regard to an agency determination that the claimant did not satisfy her burden of proof, we have said:
If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.
Dale, ¶ 22, 188 P.3d at 561 (citations omitted).
[¶ 13] "We review an agency's conclusions of law de novo, and will affirm only if the agency's conclusions are in accordance with the law." Moss v. State ex rel. Wyo. Workers' Comp. Div., 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo.2010); Dale, ¶ 26, 188 P.3d at 561-62.

DISCUSSION
[¶ 14] Although Ms. Kenyon's stated issue is general, her appellate brief includes several arguments that the OAH decision was erroneous, including: the hearing examiner failed to identify and apply the second compensable injury rule and its associated burden of proof; the hearing examiner incorrectly accepted the Division's expert's medical opinion instead of her treating physician's opinion; and the hearing examiner improperly concluded that she was not a credible witness.

1. Second Compensable Injury/Burden of Proof
[¶ 15] Ms. Kenyon asserts that the OAH erred as a matter of law by failing to apply the second compensable injury rule and its associated burden of proof, which she claims is more lenient than the preponderance of the evidence burden applied by the *850 agency.[2] The second compensable injury rule was recently described by this Court in State ex rel. Wyo. Workers' Safety & Comp. Div. v. Kaczmarek, 2009 WY 110, ¶ 9, 215 P.3d 277, 281 (Wyo.2009):
Wyoming law has long recognized that a single incident at work can give rise to more than one compensable injury. See Baldwin v. Scullion, 50 Wyo. 508, 62 P.2d 531, 539 (1936). This principle, referred to as the second compensable injury rule, applies when "an initial compensable injury ripens into a condition requiring additional medical intervention." Yenne-Tully v. State ex rel. Wyo. Workers' Safety & Comp. Div., 12 P.3d 170, 172 (Wyo.2000).
[¶ 16] The issues considered by the OAH in this case were whether the acute injury and resulting surgery in March 2006 and the subsequent total knee replacement in 2008 were the result of Ms. Kenyon's work injury on March 19, 2006, or the result of a preexisting knee condition. The OAH ruled that the 2006 injury and treatment were related to the work accident and therefore compensable, but the 2008 total knee replacement was related to her preexisting condition and not compensable.
[¶ 17] Preexisting conditions are excluded from the definition of compensable injury:
(xi) "Injury" means any harmful change in the human organism other than normal aging and includes damage to or loss of any artificial replacement and death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extrahazardous duties incident to the business. "Injury" does not include:
. . . .
(F) Any injury or condition preexisting at the time of employment with the employer against whom a claim is made[.]
Wyo. Stat. Ann. § 27-14-102(a)(xi) (Lexis-Nexis 2009).
[¶ 18] However, an employee who has a pre-existing condition may still recover if her "employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought." Dutcher, ¶ 14, 223 P.3d at 562, citing Lindbloom v. Teton Int'l, 684 P.2d 1388, 1389 (Wyo.1984) and Larson's Workmen's Compensation Law. "To prove aggravation of a preexisting condition, a claimant must demonstrate by a preponderance of the evidence that the work contributed to a material degree to the aggravation of the condition. State ex rel. Wyo. Workers' Safety & Comp. Div. v. Slaymaker, 2007 WY 65, ¶ 14, 156 P.3d 977, 981-82 (Wyo.2007)." Dutcher, ¶ 15, 223 P.3d at 562.
[¶ 19] The OAH made the following relevant conclusions regarding Ms. Kenyon's preexisting knee condition and her March 19, 2006, injury:
67. The undisputed evidence at [the] hearing proved Kenyon suffered from a significant preexisting right knee condition prior to the March 19, 2006 incident. Kenyon had undergone two surgeries and been instructed to wear a knee brace to alleviate [her] right knee pain.
68. The evidence is equally clear that Kenyon had returned to her normal activities and had been performing very physical employment for the years prior to her March 19, 2006 incident.
. . . .
71. [T]his Office finds the only evidence at [the] hearing proved Kenyon suffered an[] acute exacerbation of her pre-existing right knee condition during the March 19, 2006 incident. Both Dr. Rork and Dr. Ruttle opined Kenyon had suffered a right *851 knee injury while in the course and scope of her [work] duties. . . .
72. On March 29, 2006, Dr. Rork performed minor arthroscopic surgery to repair Kenyon's acute injury, and also addressed problems associated with Kenyon's chronic osteoarthritis which was most likely caused by Kenyon's original 1998 right knee injury.
73. Kenyon underwent a short course of physical therapy and was seen by Dr. Rork on three follow-up visits. Kenyon discontinued her treatment with Dr. Rork as of May 2, 2006.
74. Kenyon was able to golf and fish and hike after the May 2, 2006 examination. This Office finds, as Dr. Ruttle opined and the evidence indicated, Kenyon had recovered from her March 19, 2006 minor acute injury as of May 2, 2006 when she ceased treatment with Dr. Rork.
As to the treatment associated with the total knee replacement, the OAH concluded:
76. The undisputed evidence provided Kenyon sought no right knee medical treatment from May 2, 2006 until November 6, 2007 when she returned to Dr. Rork complaining of continued right knee pain. During the November 6, 2007 examination, Dr. Rork noted Kenyon was suffering from significant osteoarthritis and that Kenyon had never recovered from her March 29, 2006 surgery.
77. Kenyon admitted she sought no right knee treatment for eighteen months, but testified she suffered continued pain throughout the period. As explained above, Kenyon's testimony regarding her continued pain after May 2, 2006 was not credible. It must also be noted, Kenyon returned to her every day activities such as frequent golfing and taking care of her horses without needing additional treatment.
78. Kenyon sought no further treatment from Dr. Rork until February 1, 2008 when she returned complaining of right knee pain aggravated by activity but relieved by rest.
79. In May, 2008, Kenyon subsequently sought right knee treatment in Utah which was reportedly caused by Kenyon golfing. In late June 2008, Kenyon suffered yet another right knee injury stepping into a boat while on a fly fishing outing. Dr. Rork was not aware of Kenyon's intervening incidents and based his opinion solely on Kenyon's limited history.
[¶ 20] Under the second compensable injury rule, Ms. Kenyon would be entitled to benefits for the total knee replacement if the injury incurred at work on March 19, 2006, ripened into the condition requiring total knee replacement. It is clear that the hearing examiner considered whether the total knee replacement was caused by her 2006 injury (thus, a second compensable injury) or her preexisting condition. Regardless of whether the issue was phrased in terms of a second compensable injury ruling or not, the OAH considered the proper question in this case.
[¶ 21] Ms. Kenyon also argues that the OAH erred by applying the preponderance of the evidence burden of proof. She claims that Pino v. State ex rel. Wyo. Workers' Safety & Comp. Div., 996 P.2d 679, 685 (Wyo.2000) and Kaczmarek, ¶ 11, 215 P.3d at 282-83, indicate that the second compensable injury rule imposes a more lenient burden of proof, i.e., the claimant must demonstrate it is "more probable than not" that the first and second injury are causally related.
[¶ 22] As the OAH recognized, a claimant generally has the burden of proving each of the essential elements of her claim by a preponderance of the evidence. Dale, ¶ 35, 188 P.3d at 563; Sherwin-Williams Co. v. Borchert, 994 P.2d 959, 963 (Wyo.2000). "As a part of that burden, the claimant must prove a causal connection exists between a work-related injury and the injury for which worker's compensation benefits are being sought." Id. The definition of "preponderance of the evidence" is "proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." Judd v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2010 WY 85, ¶ 31, 233 P.3d 956, 968 (Wyo. 2010), quoting Anastos v. General Chemical Soda Ash, 2005 WY 122, ¶ 20, 120 P.3d 658, 665-66 (Wyo.2005). We recognized that *852 "preponderance of the evidence" is the same as "more probable than not" in Kaczmarek, ¶ 11, 215 P.3d at 282-83 when we referred to the burden of proof for a second compensable injury using both phrases. Thus, the burden of proof for a second compensable injury is no different than the burden applied to all claimants to show the causal connection between their injuries and their work.
[¶ 23] Ms. Kenyon may have gotten the idea that the second compensable injury burden of proof is more lenient from Kaczmarek and Yenne-Tully v. Workers' Safety & Comp. Div., 12 P.3d 170 (Wyo.2000). In Kaczmarek, ¶ 11, 215 P.3d at 282, we distinguished between the preponderance of the evidence burden of proof which applies to second compensable injuries and the more onerous burden of proof for modification of benefits under Wyo. Stat. Ann. § 27-14-605 (LexisNexis 2009). Under § 27-14-605, the claimant must prove "`to a reasonable degree of medical certainty' that the increase or decrease in capacity is `due solely to the injury.'" Id., quoting Wyo. Stat. Ann. § 27-14-605(a) & (c)(ii). See also, Casper Oil Co. v. Evenson, 888 P.2d 221, 225 (Wyo.1995). In Yenne-Tully, 12 P.3d at 172, we distinguished between the second compensable injury burden and higher standard of proof for an injury which occurs over a substantial period of time under Wyo. Stat. Ann. § 27-14-603.
[¶ 24] The hearing examiner in this case repeatedly stated that Ms. Kenyon was obligated to prove the causal connection between her injury and the employment "by a preponderance of the evidence." Therefore, we conclude the OAH applied the correct burden of proof.

2. Substantial Evidence Review of OAH Factual Findings
[¶ 25] We turn now to the OAH's factual findings. Ms. Kenyon claims the hearing examiner's decision to accept Dr. Ruttle's opinion over her treating physician, Dr. Rork's, opinion is not supported by substantial evidence. When conflicting medical opinions are presented at the contested case hearing, the agency has the
responsibility, as the trier of fact, to determine relevancy, assign probative value, and ascribe the relevant weight given to the evidence presented. Clark v. State ex rel. Wyoming Workers' Safety & Compensation Div., 934 P.2d 1269, 1271 (Wyo.1997). The [agency] is in the best position to judge and weigh medical evidence and may disregard an expert opinion if it finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based. Id.; Matter of Goddard, 914 P.2d 1233, 1238 (Wyo. 1996).

Spletzer v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo.2005). We do not re-weigh the evidence, but defer to the agency's decision so long as it is based on relevant evidence that a reasonable mind might accept as supporting that decision. Id., ¶ 22, 116 P.3d at 1112.
Chavez v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2009 WY 46, ¶ 18, 204 P.3d 967, 971 (Wyo.2009).
[¶ 26] The OAH recognized that the determining factor on the issue of whether or not Ms. Kenyon's total knee replacement was related to her work injury was the physicians' opinions. With regard to those opinions, the hearing examiner concluded:
80. This Office must weigh the opinions offered by Dr. Rork and Dr. Ruttle under the Baxter[3] standards. This Office finds that all the physicians are highly qualified and well trained professionals. This Office also finds that each physician's opinion is equally unequivocal. Thus, this Office *853 must weigh the history and reasoning behind the opinions.
81. Dr. Rork admitted that Kenyon's need for treatment in November 2007 and subsequent July 9, 2008, total [knee replacement] was caused by Kenyon's osteoarthritis which had been present prior to Kenyon's March 19, 2006 work injury; however, Dr. Rork believe[d] that Kenyon's March 19, 2006 work injury was an aggravating factor in Kenyon's ultimate need for total knee replacement. Dr. Rork did not adequately explain how he determined that Kenyon's March 19, 2006 acute right knee injury caused the extensive osteoarthritis, which was noted as early as July 2000, and which led to the July 8, 2008 arthroplasty, but just blankly asserted it was . . . "probably what tipped her over the edge."
82. Dr. Rork did not have a good history as to how Kenyon was injured on March 19, 2006 and in fact admitted he had no understanding of what Kenyon was doing at the time of the alleged work injury. Dr. Rork further did not explain why he stated Kenyon had never recovered after the March 29, 2006 surgery, when there was a break in treatment for eighteen months. Further, Dr. Rork did not know of Kenyon's May 2008 golfing incident or Kenyon's June 2008 boating incident. Reviewing the record, Dr. Rork had almost no information regarding Kenyon's recovery and activities between May 2006 and the July 2008 arthroplasty, but rather Dr. Rork based his entire opinion on Kenyon's unsubstantiated statement she never healed after the March 29, 2006 surgery.
83. Dr. Ruttle, on the other hand, had a more complete understanding of Kenyon's history. Dr. Ruttle summarized pages of Kenyon's medical records, performed an examination focused on the cause of Kenyon's need for treatment and obtained a very detailed history from Kenyon. Dr. Ruttle noted that Kenyon's 1999 surgery was more extensive and required a second surgery followed by months of knee pain, whereas? Kenyon's March 29, 2006 surgery was rather minor and after six weeks Kenyon discontinued all treatment. Dr. Ruttle knew of Kenyon's intervening injuries and also used the objective evidence in arriving at his conclusion that Kenyon had recovered from her March 19, 2006 acute injury as of May 2, 2006 and that Kenyon's treatment from November 6, 2007 forward was not related to the March 19, 2006 incident. Dr. Ruttle thoroughly explained the basis for his opinion and did not rely totally on Kenyon's unsubstantiated and less than credible history. Additionally, Dr. Ruttle based his opinion on published and accepted medical research covering the cause of osteoarthritis in knees.
84. Using the Baxter factors, this Office finds the opinion of Dr. Ruttle more persuasive than the opinion of Dr. Rork. Dr. Ruttle had a more thorough history and had a complete understanding of Kenyon's March 19, 2006 injury. Further, Dr. Ruttle thoroughly explained his opinion and supported his findings with established and accepted medical journals.
85. Accordingly, this Office finds Kenyon failed to prove that her November 6, 2007 treatment and subsequent July 9, 2008 right knee arthroplasty was caused by or related to her March 19, 2006 acute knee injury.
[¶ 27] Taking aim at specific aspects of the hearing examiner's decision, Ms. Kenyon claims the hearing examiner should not have accepted Dr. Ruttle's reasoning that she had recovered from her March 2006 work related injury on the grounds that she did not seek treatment for her injury for a year and a half. She claims Dr. Ruttle did not take into account that she was incarcerated for five of those months. Besides the obvious problem with this argumenta five month period of incarceration does not explain the eighteen month lapse in treatment, there is nothing in the record indicating that Ms. Kenyon could not have sought treatment for her knee if she needed it while she was incarcerated.
[¶ 28] Furthermore, there were other reasons Dr. Ruttle believed that Ms. Kenyon had recovered from her work injury by the time she needed the total knee replacement. He described the relatively minor nature of the 2006 injury and surgery and how that *854 compared with the more serious injury and surgeries in 1999 and 2000. He emphasized that, with the earlier injury, she sought medical treatment when the knee continued to bother her after the surgery. He contrasted that to the fact that she did not seek medical treatment for pain after she recovered from the 2006 surgery. Dr. Ruttle also noted that she lived a fairly active lifestyle after the 2006 surgery, including playing golf on a regular basis. Dr. Ruttle's opinion that Ms. Kenyon had recovered from her 2006 work related injury was reasonable and adequately supported by the facts in the record. See Chavez, ¶ 18, 204 P.3d at 971. As such, there is substantial evidence to support the OAH adoption of his opinion in that regard.
[¶ 29] Next, Ms. Kenyon faults the OAH for accepting Dr. Ruttle's opinion because it was "based on published and accepted medical research covering the cause of osteoarthritis in the knee." Dr. Ruttle's report included the following statement:
Recent work in orthopedic literature has also suggested that despite successful, stabilizing[] anterior cruciate reconstruction, patients with reconstructed anterior cruciate ligament[s] may develop arthritis within the involved knee.
Dr. Ruttle testified about the literature at his deposition. He referenced several articles indicating that patients who had ACL reconstruction and meniscetomy have a higher incidence of osteoarthritis than patients who did not.
[¶ 30] Initially, we observe that, although the hearing examiner mentioned Dr. Ruttle's statements about the literature in a couple of instances, he did so only briefly and that did not appear to be his primary consideration in accepting Dr. Ruttle's opinion over Dr. Rork's. Instead, it was simply another fact to support Dr. Ruttle's opinion that Ms. Kenyon's osteoarthritis which necessitated the total knee replacement was the result of her earlier injury rather than the 2006 work related injury. Dr. Rork's report also included an extensive rendition of Ms. Kenyon's medical history and medical records and the results of his physical examination of her. The record, therefore, contains relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Dale, ¶ 22, 188 P.3d at 561.
[¶ 31] Ms. Kenyon also criticizes the OAH finding that Dr. Ruttle's opinion was more persuasive because he was aware that Ms. Kenyon had suffered some intervening injuries between the 2006 surgery and the 2008 total knee replacement, while Dr. Rork's testimony did not indicate that he was aware of those incidents. This argument is referring to Dr. Ruttle's remark that Ms. Kenyon experienced pain and swelling in May 2008 after playing golf and in June 2008 when she stepped into a boat while fishing. She maintains it was not appropriate to discount Dr. Rork's opinion on the basis that he did not know about the incidents because they occurred after he was deposed in February 2008. However, the OAH allowed Dr. Rork to provide a response to Dr. Ruttle's deposition testimony and report after the contested case hearing. Although Dr. Rork provided an e-mail response, which was admitted into evidence, he did not address the intervening injuries. Thus, the OAH did not err by considering the fact that Dr. Ruttle took the intervening injuries into account in rendering his opinion and Dr. Rork did not.
[¶ 32] Ms. Kenyon maintains that her situation is comparable to that presented in Judd, 2010 WY 85, 233 P.3d 956. Ms. Judd suffered from preexisting degenerative arthritis in her knee, but was working full time as a physical therapy aide until she tripped and fell at work, injuring her knee. She had arthroscopic surgery, which the division covered. However, she never recovered her ability to put weight on the knee and eventually underwent total knee replacement. Id., ¶¶ 4-7, 34, 233 P.3d at 959, 969. The Medical Commission denied benefits, reasoning that the preexisting condition, rather than the fall, necessitated the total knee replacement. Id., ¶ 23, 233 P.3d at 966-67. In making that determination, the commission relied on the medical opinions of two independent evaluators instead of Ms. Judd's treating physician. The independent evaluators had concluded that "because the fall did not change the underlying knee pathology, that is physically alter the degenerative arthritis, and because Judd's total knee replacement surgery *855 was inevitable, there was no material aggravation of the preexisting condition." Id., ¶ 35, 233 P.3d at 970.
[¶ 33] We reversed, concluding that Ms. Judd had satisfied her burden of proving a work related material aggravation of her preexisting condition had led to the total knee replacement. We stated that the commission erred by relying on the independent evaluators' opinions because there is no requirement in Wyoming law that the underlying pathology must change in order to find a material aggravation of a preexisting condition. It was significant, in our view, that her physical condition and abilities changed dramatically after her fall and she did not recover until after the knee replacement surgery was performed. Id., ¶¶ 34-38, 233 P.3d at 969-71. See also, Slaymaker, 2007 WY 65, 156 P.3d 977.
[¶ 34] Judd is readily distinguishable from the case at bar because the evidence clearly showed that Ms. Judd had not recovered from her work related injury when she underwent the total knee replacement. In fact, she was unable to put weight on the knee until after the knee replacement surgery. Here, it reasonably can be concluded that Ms. Kenyon recovered after her 2006 injury and surgery and it was clear she went for eighteen months without medical treatment before returning to Dr. Rork for her total knee replacement.
[¶ 35] The present case is very similar to Chavez. Mr. Chavez injured his back at work in 1989. He had surgery on his back in 1991, and the division paid for that treatment. Mr. Chavez had a second surgery in 2006, but the division denied benefits for that surgery, reasoning that it was not related to his 1989 work injury. Id., ¶¶ 3-4, 204 P.3d at 968-69. The hearing examiner considered the testimony of Mr. Chavez's treating physician, who testified the 2006 surgery was related to the 1989 work injury, and Dr. Ruttle, who testified the surgery was not related to the work injury but was instead "due to the recurrence of what was a chronic, preexisting problem." Id., ¶¶ 13-16, 204 P.3d at 970-71. The Medical Commission accepted Dr. Ruttle's opinion over the treating physician's, and we concluded there was substantial evidence in the record to support that choice. Id., ¶ 19, 204 P.3d at 971-72. In affirming the Medical Commission, we recognized that, in its decision, it had "noted several reasons for affording more weight" to Dr. Ruttle's opinion than to Mr. Chavez's treating physician's and those reasons were supported by the medical evidence. In particular, the record established that Mr. Chavez had "recovered" and "got better" after his 1989 injury and he told his treating physician that his back pain was long standing and did not identify the 1989 incident as the cause of his pain. Id., ¶¶ 17-19, 204 P.3d at 971-72.
[¶ 36] As in Chavez, the OAH's decision included a detailed review of Dr. Rork's and Dr. Ruttle's medical opinions and a careful explanation of why it accepted Dr. Ruttle's opinion instead of Dr. Rork's. The underlying facts, including the lapse in medical treatment, Ms. Kenyon's active lifestyle after the 2006 surgery, and the medical evidence showing that she had significant preexisting osteoarthritis supported Dr. Ruttle's opinion that her preexisting condition, rather than the 2006 injury, led to her total knee replacement. The OAH decision to accept Dr. Ruttle's opinion over Dr. Rork's was "based on relevant evidence that a reasonable mind might accept as supporting that decision." Id., ¶ 18, 204 P.3d at 971, citing Spletzer, ¶ 22, 116 P.3d at 1112.
[¶ 37] Finally, Ms. Kenyon challenges the OAH determination that she was not entirely credible. The hearing examiner made the following factual findings:
19. At [the] hearing, Kenyon was very evasive in answering questions about her treatment after the March 29, 2006 right knee surgery, but eventually admitted she only had three follow-up visits with Dr. Rork. Kenyon claimed that although she quit receiving medical treatment, her knee never recovered.
20. Kenyon alleged she was in constant pain, but was performing physical therapy at home because [of] her continued knee pain.
21. Kenyon testified that she had been active all her life. . . . Kenyon alleged she was never able to return to her normal life *856 activities after the March 29, 2006, surgery but could not explain why she had completely ceased treatment if she was still suffering significant pain.
22. During her cross-examination, Kenyon admitted that for a portion of time after she ceased medical treatment in May 2006 and before she returned for treatment in November 2007, Kenyon was incarcerated.
23. When questioned as to the cause of her incarceration, Kenyon again was extremely evasive and had to be directed to answer the questions. Kenyon claimed she was jailed for "a probation violation" but would not initially expound.
24. When ordered to thoroughly answer, Kenyon eventually admitted to having been convicted of theft in 2003, which is a crime of dishonesty. Kenyon attempted to minimize her crime by claiming she was convicted "of stealing her own money back from an abusive ex-boyfriend."
25. Kenyon admitted that, at the time of the hearing, she was still on probation, even after serving five months in county jail for her prior probation revocation. Throughout all the questioning regarding her conviction, Kenyon was evasive and provided incomplete and what appeared less than truthful answers.
26. Kenyon also admitted on cross examination, grudgingly, that she only sought additional right knee treatment after an incident where she fell out of a boat and when she realized golfing caused additional pain in her right knee. Again, Kenyon attempted to minimize that any activities were the cause of her pain and added that all her pain she associates with the March 19, 2006 work injury.
Based upon these findings, the hearing examiner concluded:
53. This Office must first address the credibility of Kenyon as a witness. This Office found Kenyon to be a less than completely credible witness, but not so unbelievable that all of her testimony was rendered useless. Kenyon attempted to evade many questions and had to be instructed to answer the questions posed. Kenyon's demeanor and actions were more indicative of a witness attempting to mislead or not provide complete information. Kenyon would stare down at the floor, look away from the hearing examiner, roll her eyes and otherwise appear less than honest.
54. That being said, Kenyon's testimony in some manner was confirmed by the contemporaneously prepared medical records and therefore this Office was able to determine that at least some of Kenyon's testimony was credible; however, her testimony regarding her criminal history, her continued pain after the March 29, 2006, surgery and her inability to return to normal activities was not believable.
[¶ 38] Ms. Kenyon argues that the hearing transcript does not indicate that she had to be instructed to answer questions more thoroughly. After reviewing the transcript, we agree that Ms. Kenyon was not overtly ordered or instructed by the hearing examiner to answer the questions more thoroughly. However, it does appear that her answers were, at times, evasive and not entirely forthcoming. Moreover, the hearing examiner was in the room with Ms. Kenyon. He had the opportunity to observe the witness and hear her testimony and was, therefore, "in the best position to judge [her] demeanor, truthfulness and veracity. . . . For this reason, we defer to the fact-finder on credibility findings." Herrera v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2010 WY 103, ¶ 15, 236 P.3d 277, 282 (Wyo.2010). Under these circumstances, we defer to the hearing examiner's findings that Ms. Kenyon was not completely credible and conclude there was substantial evidence to support them.
[¶ 39] Affirmed.
NOTES
[1] The administrative proceedings were delayed numerous times. The record indicates that Ms. Kenyon's attorneys had a difficult time contacting her and, at some point, she was incarcerated for five months.
[2] Ms. Kenyon did not raise the second compensable injury rule at the agency level. We generally do not address arguments raised for the first time on appeal. However, we recognized in Carabajal v. State ex rel. Wyo. Workers' Safety & Comp. Div., 2005 WY 119, ¶¶ 20-21, 119 P.3d 947, 954 (Wyo.2005), that the application of the correct burden of proof falls within an exception to the rule because it is fundamental in nature. Thus, we addressed the legal issue of whether the second compensable injury rule should have been applied in Carabajal even though it was not specifically raised until appeal. Id.
[3] The OAH was presumably referring to the following statements from Baxter v. Sinclair Oil Corp., 2004 WY 138, ¶ 9, 100 P.3d 427, 431 (Wyo.2004):

"When presented with medical opinion testimony, the hearing examiner, as the trier of fact, is responsible for determining relevancy, assigning probative value, and ascribing the relevant weight to be given to the testimony." Bando v. Clure Bros. Furniture, 980 P.2d 323, 329 (Wyo. 1999). "In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it." Id. at 329-30.