2012 WY 47

**LARAMIE COUNTY SHERIFF'S DEPARTMENT, Appellant (Respondent),**

v.

**Kenneth COOK, Appellee (Petitioner).**

**No. S–11–0152.**

Supreme Court of Wyoming.

March 28, 2012.

Representing Appellant: Sylvia Lee Hackl, Deputy Laramie County Attorney, Cheyenne, Wyoming.

Representing Appellee: Stephen H. Kline and Melinda S. McCorkle, Kline Law Office, P.C., Cheyenne, Wyoming. Argument by Mr. Kline.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] Kenneth Cook was terminated from his employment as a Laramie County Sheriff Department (Sheriff Department) deputy for violating department policies related to report writing and firearms security. Deputy Cook requested a contested case hearing before the Laramie County Sheriff (Sheriff), who upheld his dismissal from the department. He then petitioned the district court for review. The district court reversed, concluding that the record did not contain substantial evidence demonstrating cause existed to dismiss Deputy Cook on the basis of his violation of department policies. The Sheriff's Department appealed to this Court. We agree with the district court that the record does not substantiate the Sheriff's findings that there was sufficient cause to terminate Deputy Cook's employment with the Sheriff's Department.

[¶ 2] We, therefore, affirm the district court's reversal of the Sheriff's decision.

## ISSUE

[¶ 3] Both parties present the same issue for our review:

Whether the Laramie County Sheriff's decision to terminate Appellee from his employment as a deputy sheriff was supported by substantial evidence, was in accordance with law, or was arbitrary, capricious, or constituted an abuse of discretion.

## FACTS

[¶ 4] Deputy Cook was a deputy sheriff with the Sheriff's Department. During the early morning hours of December 27, 2009, Deputy Cook was performing off-duty security for the Outlaw Saloon in Cheyenne, Wyoming. In accordance with department policy, he was dressed in uniform even though he was technically working for the Outlaw Saloon. United States Air Force Sergeant Timothy Finch, who was stationed at F.E. Warren Air Force Base, and Russell Edwards, an off-duty Cheyenne Police Department officer, got into a fight in the bar. At the request of saloon personnel, Deputy Cook and another deputy who was also working off-duty security at the Outlaw Saloon escorted the men out of the establishment. Deputy Cook took charge of Sergeant Finch, who stated that his face hurt as a result of the fight. Deputy Cook offered to call an ambulance. The sergeant initially refused but later accepted the offer, and he was transported to the hospital.

[¶ 5] After finishing his shift at the Outlaw Saloon at approximately 2:00 a.m., Deputy Cook reported for duty at the Sheriff's Department at 6:15 a.m. on the same day; he was also on duty the following three days. Deputy Cook did not initially prepare a report on the incident because he said "it wasn't a typical call for service where somebody called and asked for our help," neither Sergeant Finch nor Officer Edwards indicated he wanted to press charges, and he did not see any visible sign of injury to Sergeant Finch.

[¶ 6] On December 28, 2009, the victim assistance coordinator for the Sheriff's Department was contacted by an official from the F.E. Warren Air Force Base, seeking compensation for Sergeant Finch's injuries. He had apparently suffered a detached retina, broken eye socket and broken cheekbone. The victim assistance coordinator asked Lieutenant Linda Gesell about the incident, but she did not know anything about it. Later, the victim assistance coordinator contacted Deputy Cook and he provided information about the incident. Lieutenant Gesell walked in during this conversation and asked

for Deputy Cook's report. Deputy Cook replied that he had not written a report and did not feel that one was necessary. She instructed him to prepare a report and submit it to her the next day.

[¶ 7] Deputy Cook complied with Lieutenant Gesell's request and submitted a report the next day. Nevertheless, she opened an administrative investigation to review his possible violations of department policies during the Outlaw Saloon incident. After her investigation, Lieutenant Gesell determined that Deputy Cook had violated department policies and recommended that he be terminated from his position. Deputy Cook's supervisor, Captain Richard Hillegas, agreed with the recommendation of dismissal and placed Deputy Cook on administrative leave pending a hearing.

[¶ 8] Deputy Cook was on duty when he was placed on administrative leave and was escorted to his patrol car to gather his department-issued weapons. His department-issued shotgun was not in his patrol car, but was, instead, in a gun locker at his brother's house. Upon learning that Deputy Cook did not have the shotgun in his car, Lieutenant Gesell issued a second recommendation for termination, concluding that he had violated the department's firearm policy. Captain Hillegas again agreed with Lieutenant's Gesell's recommendation.

[¶ 9] Pursuant to Deputy Cook's request, a contested case hearing was held on April 29, 2010, before the Sheriff. After the hearing, the Sheriff issued Findings of Fact, Conclusions of Law and an Order terminating Deputy Cook from the Sheriff's Department. Deputy Cook petitioned the district court for review of the Sheriff's decision. The district court reversed, concluding that the record did not support the Sheriff's determinations that Deputy Cook had violated department policies and, consequently, did not establish cause for his termination. The Sheriff's Department appealed to this Court.

## STANDARD OF REVIEW

[¶ 10] Wyo. Stat. Ann. § 18–3–611(b) (LexisNexis 2011) states that non-probationary full-time deputies employed by large

sheriff's departments are entitled to a hearing before being dismissed from employment. The Wyoming Administrative Procedure Act governs the proceeding; accordingly, judicial review of a sheriff's decision after a contested case hearing is accomplished under Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011):

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 11] When an appeal is taken from a district court's review of an administrative agency's decision, we review the case as if it had come directly from the administrative agency without deferring to the district court's decision. *Dutcher v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 10, ¶ 9, 223 P.3d 559, 561 (Wyo. 2010); *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008). In accordance with § 16–3–114(c)(ii), we review the agency's findings of fact by applying the substantial evidence standard. *Dale,* ¶ 21, 188 P.3d at 561. Substantial evidence means

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. State ex rel. Wyo. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo.2005) (citation omitted). " 'Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.' " *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo.2011), quoting *Bush,* ¶ 5, 120 P.3d at 179.

[¶ 12] The arbitrary and capricious standard is a safety net " 'to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard.' " *Dale,* ¶ 23, 188 P.3d at 561, quoting *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 23, 49 P.3d 163, 172 (Wyo.2002). The arbitrary and capricious standard applies, for example, if "the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law." *Dale,* ¶ 23, 188 P.3d at 561. An agency's conclusions of law are always reviewed *de novo. Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo.2010); *Dale,* ¶ 22, 188 P.3d at 561.

## DISCUSSION

[¶ 13] Section 18–3–611(a) and (b) governed Deputy Cook's dismissal:

(a) This section applies to sworn non-probationary, full-time deputies of a sheriff's department which employs at least twenty (20) sworn, full-time deputies....

(b) A deputy sheriff shall not be discharged from employment, reduced in rank or suspended without pay except for cause and after notice and opportunity for a hearing. The hearing and any appeal shall be conducted in accordance with the Wyoming Administrative Procedure Act. The hearing shall be closed unless both the sheriff and the deputy involved agree otherwise.

In *Lucero v. Mathews,* 901 P.2d 1115, 1122–23 (Wyo.1995), we defined "cause" under § 18–3–611(b) as "cause or justification which bears a reasonable relationship to the deputy sheriff's ability and fitness to perform and discharge the duties of his or her position." Violation of department disciplinary policies may provide cause for termination. *See, Fisch v. Allsop,* 4 P.3d 204, 208 (Wyo.2000).

[¶ 14] The Sheriff determined that Deputy Cook had violated three different employment policies with respect to the incident at the Outlaw Saloon. His decision stated:

28. On December 27, 2009, Deputy Kevin Cook and [another deputy] worked an off-duty detail in uniform, providing security for the Outlaw Saloon. As an off-duty officer, Deputy Cook was first and foremost a deputy sheriff of the Laramie County Sheriff's Department, with "authority to enforce State law and maintain public order." Department Policy No. 07.03. Clearly, Deputy Cook and [the other deputy] were hired by the Outlaw in a uniformed, off-duty capacity because of their Wyoming Peace Officer status. During this off-duty detail, Deputy Cook was asked to escort from the bar, Airman Timothy Finch, who reported to Deputy Cook he had been sucker punched and requested an ambulance. Deputy Cook contacted the Laramie County Sheriff's Department regarding the "situation and need for an ambulance" and the Department dispatch recorded the following: "23 yoa male possible broken cheek bone." Deputy Cook was aware Finch had been injured, that at least a violent misdemeanor had occurred and knew Finch was an airman, yet failed to notify an on-duty supervisor regarding the incident or to "perform his/her duties as required by law and Department policy and procedure." Department Policy 07.03. Deputy Cook failed to take appropriate action as a certified police officer of the State of Wyoming.

29. Later the same morning of the Outlaw Saloon incident, Deputy Cook was on-duty in his position as a deputy for the Laramie County Sheriff's Department. Until [the victim assistance coordinator] received a phone call from [Air Force per-

sonnel] regarding Airman Finch, no one in the Department other than Deputies Cook [and the other deputy] knew about the altercation between Finch and Edwards in which ... Finch suffered a detached retina, fractured cheek bone and broken eye socket and was transported by ambulance to the hospital. When asked by Lt. Gesell about a report of the incident, Deputy Cook stated a report did not need to be written although he admitted in his testimony a report should have been written. Deputy Cook's failure to investigate the incident and write a report until ordered to do so exhibits unsatisfactory work performance, carelessness, failure to perform assigned duties and the exercise of poor judgment in violation of Department Policy No. 3.04.

30. Airman Finch suffered serious injuries in the altercation at the Outlaw Saloon. Deputy Cook's call to dispatch requesting an ambulance acknowledged the seriousness of Airman Finch's injuries evidenced by the dispatch record, noting "23 yoa male possible broken cheek bone." Under Department Policy No. 04.13, deputies are responsible for their own case management. Finch's request for an ambulance and the notation from Deputy Cook's call to dispatch shows Deputy Cook clearly understood that Finch had been involved in at least a violent misdemeanor, requiring a written report under Department Policy No. 04.13 C(2). Deputy Cook failed to provide a written report until ordered to do so in violation of Department Policy No. 04.13.

[¶ 15] The Sheriff referred to policies 03.04, 04.13, and 07.03 in his decision. Policy No. 03.04, titled "Employee Discipline," stated in part:

**General Provisions**

A. The Laramie County Sheriff's Department does not provide its employees with an all-inclusive list of prohibited behavior that may result in discipline. The following list represents examples of conduct that may result in disciplinary action. The list is intended to provide examples of such conduct that may re-

sult in discipline, but is not intended to be all inclusive:

. . . .

2. Failure to perform assigned duties

3. Carelessness

. . . .

10. Unsatisfactory work performance

Policy No. 04.13, titled "Case Management and Report Writing," stated in pertinent part:

**Procedure**

A. The patrol section is responsible for taking initial complaints. Reports on criminal incidents will be completed by the deputies initially assigned. Cases involving follow-up investigations will be handled by the deputy initially assigned; although, those cases that are unusually complicated may be forwarded to detectives with the approval of the shift supervisor. Deputies should complete their reports in the field as much as possible. Reports must be submitted to the records section no later than the last workday of the deputy's workweek. Reports of arrested persons or emergency detentions will be completed prior to the end of shift.

B. Deputies are responsible for their own case management. . . .

C. The following types of crimes/incidents require a written report:

2. All misdemeanors involving violence. . . .

. . . .

19. Any other incident requiring a report by Wyoming State Statutes.

The relevant part of Policy No. 07.03, titled "Off–Duty Employment," stated:

**POLICY:**

Department employees may be allowed to seek part-time, off-duty employment so long as such employment doesn't constitute a conflict of interest or interfere with Department operations.

**Definitions:**

**Off–Duty Employment**

Any employment that constitutes an activity, contract agreement or arrangement with any person, business, group, activity,

industry or endeavor, whether public or private, where payment is received by the off-duty employee for services rendered.

**Law Enforcement Work**

Any employment in which off-duty deputies are hired because of their Wyoming Peace Officer status giving them the authority to enforce State law and maintain public order.

. . . .

**Procedure:**

. . . .

**Law Enforcement Work**

A. [sic] Off-duty deputies are deputy sheriffs of the Laramie County Sheriff's Department first and foremost, and secondarily employees of their off-duty employer. In any situation where the law enforcement function of the deputy conflicts with the desires of the off-duty employer, the off-duty deputy will perform his/her duties as required by law and Department policy and procedure.

■■■ [¶ 16] We interpret the Department's employment policies by inquiring into the ordinary and obvious meaning of the words. *See, e.g., Bailey v. State, ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 152, ¶ 10, 243 P.3d 953, 956 (Wyo.2010) (interpreting administrative rules like statutes); *Town of Evansville Police Dep't v. Porter*, 2011 WY 86, ¶ 18, 256 P.3d 476, 486 (Wyo.2011) (interpreting police department personnel rule/ordinance as administrative regulation). This Court will generally "defer to an administrative agency's construction of its rules unless that construction is clearly erroneous or inconsistent with the plain meaning of the rules." *Pinther v. State of Wyoming, Dep't of Admin. & Information*, 866 P.2d 1300, 1302 (Wyo.1994).

[¶ 17] The Sheriff stated, in Paragraph 28 of his decision, that Deputy Cook violated his duties under Policy 7.03 by failing to notify an on-duty supervisor regarding the incident at the Outlaw Saloon. The clear language of Policy 7.03 requires an off-duty deputy who is performing law enforcement work to perform his duties required by law and Department policy and procedure. However, there

is nothing in Policy 7.03, or any other policy cited by the Sheriff, which required Deputy Cook to notify his supervisor of the incident. As such, the Sheriff did not have a rational premise for his finding that Deputy Cook violated Policy 7.03, and that finding is not supported by substantial evidence.

■■■ [¶ 18] In Paragraphs 29 and 30, the Sheriff stated that Deputy Cook's failure to investigate and write a report until ordered to do so violated Department Policy 4.13's requirements regarding written reports and exhibited unsatisfactory work performance, carelessness, failure to perform assigned duties and the exercise of poor judgment in violation of Department Policy 3.04. The evidentiary record does not support the Sheriff's finding that Deputy Cook failed to investigate until ordered to do so. Deputy Cook's undisputed testimony indicated that he conducted an investigation, albeit an abbreviated one, on the night of the incident. He stated that he talked with witnesses about their observations of Sergeant Finch's behavior during the night in question and the altercation between Sergeant Finch and Officer Edwards and questioned Sergeant Finch about the fight right after it occurred. Deputy Cook conducted additional investigation in preparation for filing his written report.

[¶ 19] Concerning Deputy's Cook's obligation to submit a written report, Department Policy 4.13 governed deputies' case management duties and required written reports for all misdemeanors involving violence. The policy contained no language indicating that a violation of its provisions occurred if a deputy did not write a report until ordered to do so. Instead, the clear language of the policy stated that "[r]eports must be submitted to the records section no later than the last workday of the deputy's workweek." The undisputed facts of this case established that Deputy Cook briefly investigated the incident on the night of its occurrence, conducted additional investigation after Lieutenant Gesell asked for a report, and submitted his report prior to the end of his work week on Wednesday, December 30, 2009. As such, the Sheriff's determination that Deputy Cook failed to comply with department policies in

regard to his written report is not supported by substantial evidence.

**[¶ 20]** Policy 3.04 provides a non-exclusive list of prohibited behaviors which can establish cause for discipline. The Sheriff stated that Deputy Cook violated the express provisions of Policy 3.04 by his "failure to perform assigned duties," "carelessness," and "unsatisfactory work performance." The Sheriff also stated that Deputy Cook's actions otherwise violated Policy 3.04 by exhibiting poor judgment. Although the Sheriff had authority to discipline Deputy Cook for any of those stated reasons, he did not offer any explanation of how Deputy Cook violated the policy except to say that he failed to investigate and submit a report until ordered to do so. Given our conclusion that the record does not support the Sheriff's determination that Deputy Cook violated his obligations to investigate or submit a written report, the Sheriff's findings that he violated Policy 3.04 by the same actions and such violations amounted to cause for his termination are, likewise, unsupported by substantial evidence in the record.[1]

**[¶ 21]** The Sheriff also concluded that dismissal of Deputy Cook from his position was appropriate because he violated Department Policy 5.03 by failing to properly secure his shotgun. The Sheriff's decision stated:

31. Deputy Cook was on-duty as a Sheriff's deputy at the time of his suspension from employment with the Department and according to Department procedure, was escorted to his patrol vehicle to obtain his lethal and less lethal weapons. Deputy Cook's shotgun was not in his patrol vehicle, nor was it secured in a Department weapons locker, office or his vehicle trunk. Instead, for more than a year, Deputy Cook had locked his shotgun in a gun locker at his brother's house, away from his control. Although Deputy Cook had informed Sgt. James that his gun did not

fit in the patrol car's gun mount and Sgt. Lopez testified he failed to follow up on providing either a gun case or gun mount for the shotgun, the ultimate responsibility remained with Deputy Cook to ensure his firearm was under his control. It is incredulous to think that if a situation arose in which Deputy Cook required the use of his less lethal shotgun, he could drive to his brother's house to retrieve it. By failing to secure the shotgun in a manner under his control, Deputy Cook placed the public, other deputies, himself and someone who may need the application of less than lethal force, in grave danger, violating Policy No. 05.03.

**[¶ 22]** Department Policy 05.03 was titled "Firearms/Duty Gear," and stated, in relevant part:

**Firearms Security**

A. Deputies, while on duty, are responsible for the security of all firearms under their control. Any firearms left outside the deputy's area of immediate control will be secured with a lock. This could include being locked in a weapons locker, locked office, vehicle trunk, desk, file cabinet, vehicle gun-lock, etc. Deputies while off duty, are responsible for the security of Department issued weapons under their control.

**[¶ 23]** As we stated above, we look to the ordinary and obvious meaning of the words employed in the policy to determine its meaning. *Bailey,* ¶ 10, 243 P.3d at 956; *Town of Evansville Police Dep't,* ¶ 18, 256 P.3d at 486. The policy states that on-duty deputies are responsible for the security of all firearms under their control. Lieutenant Gesell testified:

Q. What is the department's expectation with where an officer's department-issued weapons will physically be while that officer is on duty?

1. The Sheriff's Department argues, on appeal, that prior disciplinary incidents involving Deputy Cook also supported the Sheriff's decision that Deputy Cook violated Policy 3.04. There was evidence that Deputy Cook had previously been disciplined for "spark testing" his Taser in a hospital emergency room and falling asleep in

his patrol car when he was supposed to be providing security for cash stored overnight at Frontier Park during Frontier Days. Although the Sheriff referred to the incidents in his findings of fact, he did not specifically rely on those previous disciplinary actions in finding cause for Deputy Cook's dismissal in this case.

A. Well, under their immediate control. If for some reason that it has to be locked up, we would suggest a gun locker at the sheriff's department, a locked office at the sheriff's department, a locked cabinet at the sheriff's department. The trunk of their car would suffice while they're on duty in a case so they would have it. Ultimately it should be carried in their gun rack in their car.

Q. So the ideal place is in the gun rack in the car?

A. Correct.

Q. So if I see a patrol officer on the streets, I could reasonably expect there to be shotgun in the rack in his vehicle?

A. If the department issues it, yes.

. . . .

Q. So why is it—I mean, he's—I understand from [Deputy Cook's attorney] that Deputy Cook's going to testify the shotgun was, in fact, secure and that it was not accessible to other people. How does that impact his ability to serve in his role as a peace officer with it being at his brother's house?

A. When you are placed in a situation where we have to use a level of force, whether it be a low level of force or the ultimate level of force, meaning deadly force, you don't get time to call king's X and get a chance to run to your home to pick up a piece of equipment or someone else's home to pick up a piece of equipment. We don't have that luxury. We have to deal with what we have right then and there.

[¶ 24] The plain language of the policy does not support Lieutenant Gesell's interpretation. Policy 5.03 does not state that all weapons have to be within an officer's immediate control while he is on duty. It states that, while on duty, deputies "are responsible for the security of all firearms under their control." Department Policy 5.03. The policy specifically contemplates that a deputy will not always have immediate control of the weapon when it states: "Any firearms left outside the deputy's area of immediate control will be secured with a lock." *Id.* In addition, although Lieutenant Gesell testified, and the Sheriff agreed, that the policy was intended to require the shotgun to be readily available to the deputy, the policy does not state that.[2] The obvious purpose of the "Firearms Security" policy is to make sure that weapons are properly secured at all times.

[¶ 25] The undisputed facts establish that Deputy Cook's shotgun was secured in a gun locker at his brother's house. This arrangement fit within the clear meaning of the policy which required that, while outside of a deputy's immediate control, the weapon would be secured with a lock. One of the possible locations allowed by the policy was in a weapons locker. The Sheriff's ruling that Deputy Cook violated the policy by keeping his shotgun in a gun locker at his brother's house is not supported by substantial evidence.[3]

[¶ 26] We, therefore, conclude the Sheriff's determination that cause existed to discharge Deputy Cook on the basis of his violation of department policies is not supported by substantial evidence. In light of our ruling that there is no evidentiary basis for the Sheriff's decision, we do not need to specifically consider whether it was arbitrary, capricious, an abuse of discretion or otherwise contrary to law.

[¶ 27] We affirm the district court's decision reversing the Sheriff's order.

---

2. Of course, the Sheriff's Department has the authority to adopt a policy to meet the unquestionably laudable goal of requiring deputies to keep their shotguns within their immediate control while on duty.

3. There was a great deal of testimony at the hearing about the reason for Deputy Cook's decision to keep the shotgun at his brother's house. Apparently, the gun would not fit in the gun mount in his patrol car and he was unable to locate a gun case so it could be stored in the trunk of his car. One of his supervisors, Sergeant Rick Lopez, testified that he had failed, as a supervisor, to follow up after Deputy Cook told him about the problems he had with keeping his shotgun in his car. We will not delve into this aspect of the evidence as it is clear that Deputy Cook did not violate the policy by keeping his shotgun in the gun locker at his brother's house, regardless of his reasons for doing so.