2012 WY 144

**In the Matter of the Worker's Compensation Claim of Michael WILLEY, Appellant (Petitioner),**

v.

**STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

**No. S–12–0081.**

Supreme Court of Wyoming.

Nov. 14, 2012.

Representing Appellant: Donna D. Domonkos, Domonkos Law Office, Cheyenne, Wyoming.

Representing Appellee: Gregory A. Phillips, Attorney General; John D. Rossetti, Deputy Attorney General; Michael J. Finn, Senior Assistant Attorney General; Claudia Lair, Legal Intern.

Before KITE, C.J., and GOLDEN,*
HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   The Wyoming Workers' Safety and Compensation Division issued a final determination awarding Appellant, Michael Willey, a 2% permanent partial impairment benefit after Mr. Willey was injured in a work-related accident.   Mr. Willey challenges the district court's order affirming the Medical Commission's decision to uphold the Division's final determination.   We affirm.

### ISSUE

[¶ 2]   Appellant presents the following issue for our consideration:

Whether the Medical Commission's decision is supported by substantial evidence.

### FACTS

[¶ 3]   In May, 2009, Mr. Willey was injured in the course of his employment with Precision Well Service, Inc. He was injured while working under a vehicle that was suspended a few feet off the ground by a backhoe.   The vehicle slipped from its support and landed on Mr. Willey, pinning him beneath the vehicle.   He was taken to the emergency room, where x-rays suggested a "[n]ondisplaced fracture" in one of his ribs. Mr. Willey was treated and released.

[¶ 4]   Two days after the accident, Mr. Willey saw Dr. Joseph Allegretto, an orthopedist, who treated Mr. Willey for pain symptoms. Dr. Allegretto ordered an MRI, which revealed "[m]ild disc protrusion" in Mr. Willey's cervical spine, and "[m]inimal broad based protrusion" in Mr. Willey's cervical and thoracic spine, which was "not impinging on the [spinal] cord."   During the next few months, Mr. Willey was treated with spinal steroid injections and pain medication.   In September, 2009, a "large inferior scapular hematoma" that had developed as a result of Mr. Willey's accident was surgically removed from his shoulder.   Mr. Willey was subsequently referred to Dr. Tuenis Zondag, a pain management physician, for additional spinal steroid injections.   After examining Mr. Willey in January, 2010, Dr. Zondag reported that Mr. Willey had normal range of motion in his shoulder and that the steroid injections had alleviated his neck and shoulder pain.

[¶ 5]   Mr. Willey, however, continued to experience back pain and was referred to Dr. Thomas Kopitnik, a neurosurgeon, for further treatment.   Dr. Kopitnik diagnosed Mr. Willey with "mild diffuse disc bulging" in the cervical and thoracic spinal regions.   In February, 2010, Dr. Kopitnik noted that "[Mr. Willey's] last injection did help to relieve all of his pain complaints.   He no longer complains of any pain to the cervical spine or into the upper extremities.   He does have some pain upon occasion between the shoulder blades.... He states he would like to return to work full-duty.   He denies any difficulty with weakness or paraesthesias." Dr. Kopitnik also noted that Mr. Willey's "[m]otor strength is 5/5 throughout bilateral upper extremities."   On February 28, 2010, it was determined that Mr. Willey had reached maximum medical improvement.

---

* Justice Golden retired effective September 30, 2012.

[¶ 6] The following month, at the request of the Division, Dr. Allegretto examined Mr. Willey for the purpose of providing an independent medical evaluation (IME) and impairment rating. Dr. Allegretto concluded that Mr. Willey was entitled to a whole body impairment rating of 25%. His rating was based in large part on his classification of Mr. Willey's impairment as an "alteration of motion segment integrity," or AOMSI. The Division requested a second opinion from Dr. Craig Uejo, who determined that Mr. Willey should receive a 2% whole body impairment rating. In light of the discrepancy between the two ratings, the Division requested a third opinion from Dr. Franklin Shih. Dr. Shih also provided a 2% whole body impairment rating. Neither Dr. Uejo nor Dr. Shih classified Mr. Willey's injury as an AOMSI. Based on the findings of Drs. Shih and Uejo, the Division issued a final determination awarding Mr. Willey a 2% permanent partial impairment benefit.

[¶ 7] Mr. Willey challenged the Division's final determination, and the matter was referred to the Medical Commission Hearing Panel. A hearing was held on June 23, 2011. During the hearing, the Medical Commission heard testimony from Mr. Willey and was presented with relevant medical records, as well as Dr. Uejo's evaluation report and the deposition testimony of Dr. Shih and Dr. Allegretto. The Commission concluded that Mr. Willey's injuries should not be classified as an AOMSI, and determined that the "medical records are strongly corroborative of the 2% whole body physical impairment award." The Commission ultimately determined that "Mr. Willey has failed to meet his burden of proof that he is entitled to a physical impairment rating beyond the 2% whole body rating provided by the Division as a result of his work injury of May 21, 2009." The district court affirmed the Medical Commission's decision. Mr. Willey timely appealed the district court's order.

### STANDARD OF REVIEW

[¶ 8] Review of an administrative agency's action is governed by the Wyoming Administrative Procedure Act, which provides that:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

. . .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009).

[¶ 9] Under this statute, we review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.,* ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo.2011).

## DISCUSSION

[¶ 10] A claimant in a workers' compensation case has the burden to prove all the elements of the claim by a preponderance of the evidence. *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo.2011). A preponderance of the evidence is "proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." *Id.* The Division concedes that Mr. Willey experienced a work-related injury, for which he was entitled to workers' compensation benefits. The dispute in this case focuses on the extent of Mr. Willey's injury and, more specifically, the proper impairment rating for the injury.

[¶ 11] Under the Wyoming Worker's Compensation Act, a licensed physician must rate an employee's physical impairment using the most recent edition of the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (*AMA Guides*).[1] Wyo. Stat. Ann. § 27–14–405(g). The Act provides that if the percentage of physical impairment is disputed, the Division must obtain a second opinion. Wyo. Stat. Ann. § 27–14–405(m). Any objection to the Division's final determination is then referred to the Medical Commission for a hearing. *Id.*

[¶ 12] Mr. Willey contends that the Medical Commission's decision is not supported by substantial evidence. He asserts that the Commission's decision to reject Dr. Allegretto's impairment rating was "clearly contrary to the overwhelming weight of the evidence" because Dr. Allegretto's rating was based on his history of treating Mr. Willey, and was made after a thorough physical examination and review of Mr. Willey's medical records. In contrast, he points out that Dr. Uejo performed only a review of Mr. Willey's medical records, and that Dr. Shih conducted only a brief physical examination before arriving at a 2% impairment rating. Mr. Willey also takes issue with the Commission's finding that he was not a credible witness because he exaggerated the extent of his injury and symptoms.

[¶ 13] The Division contends that the Commission's decision should be upheld because it is supported by the opinions of Dr. Shih and Dr. Uejo, and that the Medical Commission could properly rely on Dr. Shih's and Dr. Uejo's application of the *AMA Guides* in determining Mr. Willey's impairment rating. The Division also claims that the Commission's determination with respect to Mr. Willey's credibility is supported by the evidence. The Division concludes that "[Mr. Willey's] medical records, the Division's expert assessments as well as the expert testimony provided by the Division[']s physicians, all provide substantial evidence to allow the Commission to reasonably conclude that the proper rating is 2%." We agree with the Division.

[¶ 14] At the contested case hearing, counsel for Mr. Willey framed the issue before the Medical Commission as follows: "Basically[,] this case relies on the technical application of the [*AMA Guides* ]. And as an attorney, or as a layperson, we don't know a lot [about] how to do that." On appeal, Mr. Willey argues that Dr. Allegretto correctly applied the *AMA Guides* in classifying his impairment as an AOMSI, and places emphasis on the following excerpt from Dr. Allegretto's deposition testimony:

> The mechanism of injury is consistent with what I saw on physical exam and consistent with what I saw on the imaging studies, the MRI scan. So because those two things showed damage to the discs of the thoracic spine, as well as affiliated injuries of the musculature, I said that this was an alteration of several mobile segments—that's the MS—and that was basically thrown out by both of the other raters as being likely.
>
> The difficulty with the thoracic spine as opposed to the cervical spine and the lumbar spine is that there's no good way to test the neurologic elements like there is in the cervical or lumbar spine.
>
> And you know, I've gone through this book several times, and it talks about loss of reflexes, motor strength loss, sensory loss, as documentation of nerve injury.

1. The parties agree that the 6th Edition is the most recent edition of the *AMA Guides*.

And that's all true. However, in the thoracic spine, the nerves have significant overlap from one to the other, they individually will innervate the muscles of the trunk, okay? So you can't pinpoint one nerve goes to one muscle, it's all the nerves go to all the muscles.

And so if you have deficits of the nerves, the muscles will still function because of the remaining nerves that go to the remaining healthy nerves that go to the muscle, so you can't use musculature deficits. There are no reflexes in the thoracic spine, and really what you're left with is sensory aberration. And the pain drawing that I had [Mr. Willey] fill out at the time of his examination for his IME, show exactly that, sensory distribution abnormalities in the thoracic spine on the right side, and that's consistent with where his thoracic spine MR was abnormal. So that's why I did that.

And if I can, I'll read you the specific diagnostic criteria there, that may be helpful. For the thoracic spine—and I'm reading from the Sixth Edition [of the *AMA Guides* ], page 567—a Class 4, invertebral disc herniation or AOMSI at multiple levels with medically documented injury with or without surgery. And he clearly met all three of those.

And, documented signs of bilateral or multiple level radiculopathy at the clinically appropriate levels present at the time of examination.

So he clearly meets that based on his pain drawing and based on my physical exam. They chose to use the Class 0, or a different class all together, like nonspecific chronic recurrent thoracic pain, I believe [Dr. Uejo] did, which is a Class 1, and that's why his rating was two percent because he went to this one up here—if you don't mind me pointing—and he failed to put the correlative physical examination points that I had on my exam.

As I read through his impairment rating, he did not look at my examination findings at all. And because of that, he would miss these findings over here. How can he miss that these are disc herniations? I don't know. It's clearly stated in the radiographic report. If he didn't review the scan itself, he would have no appreciation for that. The only reason that I can come up [with] is he discounted it as preexisting, and I suspect that's an argument, but this is a gentleman who was asymptomatic before, so I have to go with that philosophy.

So this is the crux of the difference is because I choose this one, which he meets all of these, those criteria, and also the shoulder was rated as zero percent by the other raters, and because I did a range of motion that showed deficits, he ended up with seven percent based on the deficits of his range of motion.

[¶ 15] Dr. Shih, however, testified in his deposition that classification of Mr. Willey's impairment as an AOMSI was not supported by the medical records, and that Dr. Allegretto had misapplied the *Guides:*

So now if we get to this specific definition of an altered motion segment, at the very end of the table for the cervical spine, it indicates, Note: Alteration of motion segment integrity indicates AOMSI. It is defined using flexion/extension x-rays, (figure 17–5 and 17–6).

In the cervical spine, a diagnosis of AOMSI by translation method requires greater than 20 percent anterior, or greater than 20 percent posterior relative translation of one vertebrae on another on flexion or extension radiographs, [respectively]; or angular motion of more than 11 degrees greater than each of these adjacent levels.

Alternatively, there may be complete or near complete loss of motion of a motion segment due to developmental fusion or successful or unsuccessful [attempts at] surgical arthrodesis, includ[ing] [dynamic stabilization, or] preserved motion with [disk] arthroplasty.

In the cervical spine, these specific parameters apply to motion segments from C3 to C7.

So the bottom line is Mr. Willey didn't fit into the [AOMSI] category, so the discrepancy between Dr. Allegretto and myself is Dr. Allegretto put Mr. Willey into a

diagnostic category that the medical records do not confirm.

. . .

The simplest way for you to understand it is if the x-rays show abnormal degrees of motion in terms of instability, then you can qualify this as [an AOMSI]; and the other way you can qualify it as an [AOMSI] is if we have done surgically something to the spine; so, for example, doing a fusion alters a motion segment; doing a disk replacement surgery alters the motion segment. And so it can either be radiographically proven instability of the spine, or we did something that we know inherently what we did to it, being a fusion or a disk replacement, changed the motion segment.

. . .

Dr. Allegretto misapplied the Sixth Edition, so there are no diagnostic criteria that allow[ ] him to call this an [AOMSI]. So again, the reason I read all the stuff that I read to you is that the Sixth Edition is actually very specific; that you have to have this, or this, or this to qualify as an [AOMSI]. And so the reason Dr. Allegretto was able to come up with a different class was he called it an [AOMSI]; but unfortunately, the pathology doesn't meet the criterion for an [AOMSI]. And that's not an interpretation. If you read the Sixth Edition definition of an [AOMSI], there's no documentation of any of the conditions that qualify him for an [AOMSI].

(Quotation marks omitted.) Dr. Shih concluded that a 2% impairment rating was appropriate under the 6th Edition of the *AMA Guides:*

At this point the ratable areas appear to be cervical and thoracic spine. Rating in this case is somewhat difficult given Mr. Willey's rather non-physiologic presentation. If I were to base Mr. Willey's impairment rating on today's evaluation alone, his impairment rating would be zero percent given his rather inconsistent and non-physiologic presentation. Given, however, the review of the overall medical records and some consistency in physical findings, I felt it was appropriate to go

ahead with an impairment rating. Mr. Willey would qualify for cervical and thoracic spine impairment. He would fall in the class diagnosis level 1 for each area. He does not have radiographic findings that are significant nor does he have physical exam findings that are significant. I do not find Mr. Willey's functional history to be credible and so [I am] not applying that as a modifier. Mr. Willey would have an adjustment grade of –2 for the cervical and thoracic regions, which would then result in a one percent whole person impairment for the cervical spine and one percent whole person impairment for the thoracic spine. His overall impairment would be a two percent whole person.

[¶ 16] Similarly, Dr. Uejo concluded in his report that no records supported the existence of a verifiable thoracic or cervical radiculopathy, or an AOMSI. With regard to Mr. Willey's thoracic spinal area, Dr. Uejo stated as follows:

The *Guides* approach to the evaluation of impairment due to thoracic strain is based on Section 17.2, Diagnosis–Based Impairment (DBI) (6th ed., 560) and Section 17.2b, Thoracic Spine (6th ed., 563). The most applicable diagnosis would appear to be Thoracic Spondylitis disease as outlined in Dr. Zondag's January 14, 2010 report. Although epidural injections were performed, no records support the existence of a verifiable thoracic radiculopathy or Alteration of Motion Segment Integrity (AOMSI). A "possible" compression fracture of the T3 thoracic vertebral body is described by Dr. Zondag, yet not confirmed in radiological reports provided or other physician's opinions as an injury found or related to the work injury.

Dr. Uejo made similar findings with regard to Mr. Willey's cervical spine:

The *Guides* approach to the evaluation of impairment due to cervical strain is based on Section 17.2, Diagnosis–Based Impairment (6th ed., 560), and Section 17.2a, Cervical Spine (6th ed., 563). The most applicable diagnosis for the cervical spine would be similar to the thoracic spine with Cervical Spondylitis disease. Although epidural injections were performed,

no records support the existence of a verifiable cervical radiculopathy, or Alteration of Motion Segment Integrity (AOMSI).

In Dr. Uejo's "Final Impairment Rating Summary," he concluded that

Due to the specific injury on May 21, 2009, the examinee sustained injury to his cervical, thoracic spine and right shoulder. The medical history and clinical findings were thoroughly reviewed for supported impairment. At maximum medical improvement, the medical condition of the examinee supported 1% WPI [whole person impairment] in the cervical spine, 1% WPI in the thoracic spine and 0% WPI for the right shoulder.

Dr. Uejo's report notes that he is an Associate Editor of *The Guides Casebook*, a reviewer of the 6th Edition of the *AMA Guides*, and an Associate Editor for the *AMA Guides Newsletter*.

[¶ 17] The Medical Commission considered Dr. Allegretto's testimony, but was ultimately persuaded by the opinions of Dr. Shih and Dr. Uejo, who both concluded that Mr. Willey was entitled to a 2% impairment rating:

In reviewing the physical impairment ratings, we note the extreme discrepancy between Dr. Shih and Dr. Uejo's 2%, and Dr. Allegretto's 25% whole body rating. The primary discrepancy between the two revolves around the thoracic spine regional grid classification, set forth in the AMA Guides, Sixth Edition, on Page 567, Table 17–3. Dr. Allegretto immediately placed Mr. Willey in the Class 4 category, (most serious) which requires the inclusion of certain medical criteria, including "documented signs of a residual bilateral or multiple-level radiculopathy at the clinically appropriate levels present at the time of examination." (AMA Guides, Sixth Edition, Table 17–3, Class 4).

. . .

This Panel agrees with Dr. Shih and Dr. Uejo's analysis regarding the AOMSI. Dr. Allegretto rated Mr. Willey into the Class 4 Level, and the underlying medical records do not support that classification. Dr. Allegretto, in essence, is saying that Mr. Willey has spine instability at multiple levels with documented signs of residual bilateral or multiple level radiculopathy at the clinically appropriate levels, but the medical records submitted do not support the classification, and Mr. Willey does not have documented radiculopathy at any level that would support such a finding.

In discussing what sort of objective evidence was missing in documenting any radiculopathy, Dr. Shih indicated the following:

A nerve conduction study would be a truly objective study. But Dr. Allegretto is correct in that it really can't be utilized effectively in a thoracic spine. You can get—actually back up on that.

You can get information from just inserting needles into the thoracic paraspinous musculature; so there actually is information that you can get from the needle component of the examination, just in the thoracic paraspinous musculature.

But as an electographer, we like to have multiple muscles showing abnormalities to confirm a diagnosis; and when we just look at the paraspinous musculature, that doesn't allow us to show that we looked at multiple levels to confirm the diagnoses.

The other way to confirm radiculopathy would be through consistent clinical examination, so if you can, weakness in a L4 distribution. If you had a sensory loss in a L4 distribution, and if you had reflex changes in L4 distribution, then I would feel pretty comfortable saying that was objective evidence of a L4 radiculopathy.

If you want to bump it up a notch, if you had atrophy in a L4 distribution, that would make it even better; and then if you want to bump it up another notch, if you had EMG (electromyelogram) findings consistent with the L4, that would nail it.

Q. [Counsel] And what you're saying, from your review of these records, these objective findings were lacking?

A: (Dr. Shih) That's correct. (Employee/Claimant's Exhibit 14, Page 10, Shih Deposition, Pages 30–31).

This Panel agrees with the physical impairment ratings of Drs. Shih and Uejo, and we find that the submitted medical records are strongly corroborative of the 2% whole body physical impairment award. Dr. Allegretto made the jump into a Class 4 Category without supporting documentation. Clearly, Mr. Willey does not suffer from spine joint instability, nor is there any medical documentation thereof. We reject Dr. Allegretto's physical impairment rating for that reason, and find that the rating is not supported by the medical evidence.

[¶ 18] We conclude that the Medical Commission's findings are supported by substantial evidence. As we have previously stated, "It is the obligation of the trier of fact to sort through and weigh the differences in evidence and testimony, including that obtained from medical experts." *In re Worker's Comp. Claim of David v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2007 WY 22, ¶ 15, 151 P.3d 280, 290 (Wyo.2007). Further, we have noted that "The Commission is in the best position to judge and weigh medical evidence and may disregard an expert opinion if it finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based." *Spletzer v. Wyo. ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 90, ¶ 21, 116 P.3d 1103, 1112 (Wyo.2005). After reviewing conflicting testimony and reports of the medical experts, the Medical Commission found the opinions of Drs. Shih and Uejo to be more persuasive than Dr. Allegretto's opinion, and explained its reasons for that finding in its order. While we recognize that Dr. Allegretto was a "treating physician," and that Dr. Shih and Dr. Uejo do not fit into that category, the weight to be given to the opinions of those doctors is within the province of the Medical Commission. In light of the expert opinions of Drs. Shih and Uejo, the criteria set forth in the *AMA Guides*, Mr. Willey's medical records, and Mr. Willey's symptoms at the time of the hearing, there was substantial evidence to support the Commission's conclusion that Mr. Willey's impairment did not involve an alteration of motion segment integrity, as determined by Dr. Allegretto, and that a 2% whole person impairment rating was consistent with Mr. Willey's medical history.

[¶ 19] As a final matter, we note that Mr. Willey also challenges the Medical Commission's finding that he was not a credible witness. The Commission found that Mr. Willey was "not an entirely credible witness," in part because his account of his pain and other symptoms was not consistent with his medical records:

> The Medical Panel finds that Mr. Willey is not an entirely credible witness. He tends to exaggerate the significance of the injury, particularly to his thoracic spine. He indicated that he had nine broken ribs, but medical records indicate that he actually only fractured one rib. Mr. Willey was worked up in a very thorough manner after the work injury and we note that Dr. Zondag found that he had almost [a] full range of motion in his shoulder and had 5/5 motor strength in his bilateral upper extremities. Mr. Willey also testified that he got very little relief from the injections that had been provided to him by Todd Hammond, M.D., of Casper, Wyoming, but the medical records submitted in Employee/Claimant's Exhibit 9, Page 5, indicated that "Prior to the injections, the patient stated [his] pain was 8.5 out of a possible 10. Afterwards, the patient stated [his] pain was 5.5 out of a possible 10."
>
> . . .
>
> We also further note that Mr. Willey seems to have a tendency to exaggerate or embellish the magnitude of his injury. In Dr. Shih's examination of Mr. Willey, he noted numerous non-physiologic complaints that did not conform with physical examination or medical records. We observed the same characteristics at Mr. Willey's Evidentiary Hearing. Mr. Willey is fully employed, with only a greater than 50 pound lifting limitation, he does not take pain medication for the work injury, has not had nor is he a likely candidate for surgery, and he is not receiving any sort of ongoing medical care for his work related

condition. We reject the 25% physical impairment rating conducted by Dr. Allegretto as unrealistic and inconsistent with the medical records. Mr. Willey is entitled to a 2% whole body physical impairment award.

Mr. Willey contends that the Medical Commission, in making its credibility determination, mischaracterized his testimony relating to the number of ribs that he fractured at the time of injury, and misinterpreted his testimony regarding his need for pain medication. He notes that his testimony was that his x-rays had showed "one fractured rib and one cracked rib," rather than nine broken ribs. He also notes that his testimony was that he did not continue to take pain medications because they made his life "more miserable."

[¶ 20] We give substantial deference to a hearing examiner's credibility findings: "Credibility determinations are the unique province of the hearing examiner, and we eschew re-weighing those conclusions. We defer to the agency's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence." *Beall v. Sky Blue Enters. (In re Beall),* 2012 WY 38, ¶ 28, 271 P.3d 1022, 1034 (Wyo.2012) (internal citation omitted). Mr. Willey appears to be correct in his assertion that the Medical Commission mischaracterized his testimony relating to the number of ribs he fractured at the time of his accident. However, he does not address the fact that there remains a discrepancy between his testimony at the hearing, where he claimed to have had "one fractured rib and one cracked rib," and his medical records, which state that a "focal irregularity" was "suggestive of a nondisplaced fracture" in one of his ribs. Beyond this specific quarrel with the Commission's findings, however, Mr. Willey's challenge to the Commission's credibility determination lacks substance. The evidence in the record supports the Commission's finding that Mr. Willey tended to exaggerate the extent of his symptoms. Ultimately, however, the Commission's findings with respect to Mr. Willey's credibility had little, if any, bearing on its decision to uphold the Division's award of a 2% impairment benefit. As set forth above, that decision was based on Mr. Willey's medical records, the assessments of Mr. Willey's impairment by Dr. Shih and Dr. Uejo, and the criteria set forth in the *AMA Guides.* Accordingly, even if we found that the Medical Commission's credibility findings were not supported by the record, substantial evidence would remain to support the Commission's decision.

[¶ 21] Affirmed.