# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 25

**OCTOBER TERM, A.D. 2013**

**February 21, 2014**

DEANA V. LANDWEHR, a/k/a DEANA
STREUBING,

Appellant
(Petitioner),

v.

No. S-13-0139

STATE OF WYOMING, ex rel., WYOMING
WORKERS' SAFETY AND COMPENSATION
DIVISION,

Appellee
(Respondent).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*

   *Dana J. Lent, Attorney at Law, Torrington, Wyoming.*

*Representing Appellee:*

   *Peter K. Michael, Attorney General; John D. Rossetti, Deputy Attorney General;
   Michael J. Finn, Senior Assistant Attorney General; Brenda S. Yamaji, Assistant
   Attorney General.*

*Before KITE, C.J., and HILL, VOIGT\*, BURKE, and DAVIS, JJ.*

*\*Justice Voigt retired effective January 3, 2014.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BURKE, Justice.**

[¶1]    The Wyoming Workers' Safety and Compensation Division awarded benefits to Appellant, Deana Landwehr, after she experienced a workplace injury to her back in 1999.  In 2008, Ms. Landwehr experienced a second workplace injury while employed in Nebraska.  In 2010, Ms. Landwehr sought payment for prescription medication that she claimed was necessary treatment relating to her 1999 workplace injury. The Division denied the claim.  Ms. Landwehr requested a contested case hearing, and the hearing examiner upheld the Division's denial of benefits.  Ms. Landwehr appealed to the district court, which affirmed the hearing examiner's order.  She challenges the district court's decision in this appeal.  We affirm.

## ISSUE

[¶2]    Ms. Landwehr presents the following issue:

> Was the hearing examiner's determination that Appellant failed to satisfy her burden of proof unsupported by substantial evidence in the record as a whole?

## FACTS

[¶3]    In August, 1999, Ms. Landwehr sustained a work-related injury while working as a nursing assistant for Cheyenne Health Care Center.  Ms. Landwehr hurt her back when she attempted to lift a patient from her wheelchair.  Six days later, she sought medical treatment at a primary care clinic, where she reported mid-back pain and "an associated extremity numbness and tingling . . . intermittent with this pain."  Dr. John J. Viola saw Ms. Landwehr approximately three weeks later for a neurosurgical consultation.  After performing a physical examination, Dr. Viola concluded that Ms. Landwehr "has predominantly elements of a thoracic strain" and that physical therapy would likely be the most appropriate treatment.

[¶4]    In September, 1999, Dr. Viola ordered an MRI of Ms. Landwehr's back, which revealed the following findings:

> The alignment of the thoracic spine is normal.  There is normal bone marrow signal in each vertebral body with no evidence of hemorrhage or bone marrow replacement.  There is mild disc space narrowing in the mid thoracic spine at T6-7, T7-8, and T8-9 but no evidence of disc herniation or thecal sac impingement.  No impingement of the thoracic spinal cord.  The cord is normal in size and signal at all points and no posterior abnormalities or paravertebral abnormalities.

1

In the "Impression" section of the report, it was noted that there were "No focal findings to explain mid back pain." At a follow-up visit on September 10, Dr. Viola noted that Ms. Landwehr's symptoms had "neither improved nor worsened."

[¶5]    Ms. Landwehr began participating in a physical therapy program, and, after an evaluation on October 1, Dr. Viola noted that she was "making progress in physical therapy." In a progress note dated November 3, Ms. Landwehr's physical therapist noted that her "primary complaints continue to be focused in the thoracic spine." However, after Dr. Viola evaluated Ms. Landwehr in December, he noted for the first time that she was having neck pain and headaches in addition to numbness in her right hand. Dr. Viola referred Ms. Landwehr to Dr. Harlan R. Ribnik, a pain management physician, who ordered another MRI of Ms. Landwehr's back. That MRI also revealed that "Disc height and disc signal intensity is normal at every level." The "Impression" section of the MRI report stated that there was "No [magnetic resonance] evidence of focal cervical disc herniation to explain the neck pain" and "no evidence of a C5-C6 disc herniation." Dr. Ribnik gave Ms. Landwehr a cervical epidural steroid injection on January 6, 2000, but she received "minimal, if any relief from her pain." As a result of her injury, Ms. Landwehr received temporary total disability benefits from the Division. After those benefits expired, she went back to work as a unit secretary.

[¶6]    In June, 2000, Dr. Viola referred Ms. Landwehr to Dr. Reed Shafer, who conducted an electrodiagnostic study of Ms. Landwehr's upper extremities. The nerve study revealed that Ms. Landwehr "does not have evidence of primary muscle disease or nerve root problems" but that she "certainly does have evidence of median neuropathy at the level of the wrist, compatible with her clinical carpal tunnel syndrome." At a follow-up visit, Dr. Viola diagnosed Ms. Landwehr with "carpal tunnel syndrome right greater than left." Dr. Viola stated that "it is reasonable for [Ms. Landwehr] to consider surgical release of her carpal tunnel syndrome" and noted that Ms. Landwehr indicated her willingness to proceed with the necessary surgery. There is no indication in the record, however, that Ms. Landwehr ever opted to undergo surgery to treat her carpal tunnel syndrome. Dr. Viola prescribed Celebrex to relieve Ms. Landwehr's carpal tunnel symptoms. In September, 2000, Ms. Landwehr received a 12% whole body impairment rating as a result of her workplace injury, and the Division awarded permanent partial impairment benefits to Ms. Landwehr.

[¶7]    Over the next several years, Ms. Landwehr continued to report "neck, shoulder, [and] right upper extremity pain," as well as headaches, to multiple treating physicians. In 2003, her primary care physician, Dr. Jeanette Larson, diagnosed her with fibromyalgia, which she treated with various prescription medications, including Flexeril, Neurontin, and Tramadol. In 2004, Ms. Landwehr moved to Ogallala, Nebraska, but she continued to see Dr. Ribnik on a semi-annual basis until April, 2005 when, according to Ms. Landwehr, he refused to see her or refer her to another doctor.

2

[¶8]    In September, 2006, Ms. Landwehr saw Dr. Kurt Hopfensperger in Cheyenne for a neurologic consultation.  In his report of the evaluation, Dr. Hopfensperger noted that a review of Ms. Landwehr's systems revealed, among other ailments, "fatigue, chronic sinus drainage, frequent headaches, lightheadedness, numbness and tingling, joint pain, joint stiffness, muscle weakness, muscle pain, back pain, cold extremities, difficulty walking, peptic ulcer, nervousness, insomnia, [and] depression[.]"  Although Dr. Hopfensperger was unable to diagnose any specific disease or disorder based on Ms. Landwehr's symptoms, he prescribed duloxetine (Cymbalta) to treat Ms. Landwehr's headaches and the symptoms in her extremities.  Dr. Hopfensperger ordered an MRI of Ms. Landwehr's thoracic spine, which revealed that "Thoracic marrow signal intensity is normal.  There is no significant canal stenosis.  No significant disc herniations are identified."  After a follow-up visit in April, 2007, Dr. Hopfensperger noted that Ms. Landwehr had stated that the duloxetine was "working good," but that she "continues however to have neck and back pain, as well as tingling in her upper extremities distally."  He noted that "Regarding her neck and back pain, I do not [have] anything to offer this patient." After determining that Ms. Landwehr's MRI was "negative," Dr. Hopfensperger ordered a nerve conduction study.  That study revealed, similar to the previous nerve conduction study ordered by Dr. Viola, that Ms. Landwehr had "[a]dvanced right carpal tunnel syndrome" and "[m]oderate left carpal tunnel syndrome."

[¶9]    In January, 2008, Ms. Landwehr experienced a second work-related injury while employed in the bakery at a grocery store in Nebraska.  According to Ms. Landwehr, she was injured when a ten-pound muffin pan fell from a drying rack and struck her on the head, shoulder, and shin.  She experienced severe headaches, nausea, vomiting, dizziness, and confusion as a result of her injury.  After this incident, Ms. Landwehr sought treatment at the Sandhills District Health Clinic, where she was seen by Nurse Frankie Cordova.  Nurse Cordova noted that "Patient is being seen here today for headaches.  She was hit in the head with a tin pan and she thinks maybe that is what is causing them."  Ms. Landwehr controlled her pain with prescription medication until her headaches returned in March, 2008.  At that point, Nurse Cordova ordered an MRI, but the results were "unremarkable."  Ms. Landwehr was subsequently referred to a neurologist in Nebraska, but no notes from that visit are contained in the record.  In April, Ms. Landwehr saw Dr. Hopfensperger for her annual follow-up visit. Dr. Hopfensperger's notes from that visit provide, in relevant part, as follows:

> Ms. Landwehr returns for annual follow-up today.  She found that Cymbalta was "doing great" for her pain until several months ago when she was struck by a 10 pound muffin [pan] at work, and was hit in [the] head.  She was diagnosed by her physician as having whiplash, and was prescribed Neurontin and Midrin for headaches.  She also tried Lyrica which was of no benefit.  She tells me that her physician is sending her to

another neurologist in North Platte, Nebraska to workup a possible new neck injury related to a work injury.

. . .

This patient was sent to me for various issues related to workers comp injury and I have treated her with Cymbalta with some success. She is now being apparently referred by her primary physician to another neurologist in Nebraska. I refilled her Cymbalta as it has worked for her, and my guess is this other neurologist will therefore workup any further issues. I will see her back in a year if she is still taking the Cymbalta prescribed by this office, but otherwise she does not need to return to this office. This was discussed with patient and she is in agreement.

Ms. Landwehr filed a worker's compensation claim in Nebraska relating to her 2008 injury and subsequently settled that claim.

[¶10] Ms. Landwehr returned to Dr. Hopfensperger in April, 2009, to renew her duloxetine prescription. However, in April, 2010, when Ms. Landwehr went to see Dr. Hopfensperger for her annual prescription renewal, she was informed that the appointment was cancelled because it was no longer being covered by the Division. On April 1, 2010, the Division issued a Final Determination denying payment for her medical treatment based on the definition of "injury" set forth in Wyo. Stat. Ann. § 27-14-102(a)(xi) (LexisNexis 2009).[1] The Final Determination stated that "Information has been received and reviewed indicating an intervening incident occurred" and that the "current treatment and medications are unrelated to the original Workers' Compensation injury of August 6, 1999." Ms. Landwehr objected to the denial of benefits, and the matter was referred to the Office of Administrative Hearings for a contested case hearing.

---

[1] Wyo. Stat. Ann. § 27-14-102(a)(xi) provides, in pertinent part, as follows:

(xi) "Injury" means any harmful change in the human organism other than normal aging and includes damage to or loss of any artificial replacement and death, arising out of and in the course of employment while at work in or about the premises occupied, used or controlled by the employer and incurred while at work in places where the employer's business requires an employee's presence and which subjects the employee to extrahazardous duties incident to the business.

[¶11] Ms. Landwehr's contested case hearing was held on March 24, 2011. The hearing examiner was presented with Ms. Landwehr's medical records, as well as the deposition testimony of Dr. Hopfensperger, and heard live testimony from Ms. Landwehr. On April 25, 2011, the hearing examiner issued an order upholding the Division's denial of benefits. The hearing examiner concluded that Ms. Landwehr "did not prove the requisite causal connection between her present complaints of headaches and her 1999 work related mid-thoracic strain." Ms. Landwehr filed a petition for judicial review in district court, and the district court affirmed. Ms. Landwehr filed a timely appeal from the district court's decision. Additional facts will be presented as necessary in the discussion below.

## STANDARD OF REVIEW

[¶12] Review of an administrative agency's action is governed by the Wyoming Administrative Procedure Act, which provides that:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> > (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
> >
> > (B) Contrary to constitutional right, power, privilege or immunity;
> >
> > (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
> >
> > (D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c). We review an administrative agency's findings of fact pursuant to the substantial evidence test. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Id.*, ¶ 11, 188 P.3d at 558. Findings of fact are supported by substantial evidence if, from the evidence in the record, this Court can discern a rational premise for the agency's findings. *Middlemass v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 118, ¶ 11, 259 P.3d 1161, 1164 (Wyo. 2011).

[¶13] When the hearing examiner determines that the burdened party failed to meet his burden of proof, we must decide whether that determination was contrary to the overwhelming weight of the evidence. *Leavitt v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 95, ¶ 18, 307 P.3d 835, 840 (Wyo. 2013). We defer to the hearing examiner's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence. *Id.* "If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test." *Dale*, ¶ 22, 188 P.3d at 561.

### DISCUSSION

[¶14] A claimant in a worker's compensation case has the burden of proving all of the elements of the claim by a preponderance of the evidence. *Mitcheson v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 74, ¶ 11, 277 P.3d 725, 730 (Wyo. 2012). As part of that burden, the claimant must prove a causal connection exists between a work-related injury and the injury for which workers' compensation benefits are sought. *Id.* A preponderance of the evidence is "proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." *Id.* (quoting *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 22, 247 P.3d 845, 851 (Wyo. 2011). A claimant must satisfy this burden for all outstanding claims despite previous awards for the same injury. *Hall v. State ex rel. Wyo. Workers' Comp. Div.*, 2001 WY 136, ¶ 14, 37 P.3d 373, 377 (Wyo. 2001). The worker's compensation statutes do "not guarantee a claimant future benefits on the basis of a prior award nor does public policy favor the payment of an unjustified worker's compensation claim." *Id.* It is undisputed that Ms. Landwehr experienced a compensable injury in August, 1999. However, Ms. Landwehr also had the burden to prove, by a preponderance of the evidence, that her 2010 symptoms were causally related to her workplace injury. Ms. Landwehr contends the hearing examiner's conclusion that there was no causal

connection between her 1999 workplace injury and her 2010 symptoms was not supported by substantial evidence.

[¶15] Initially, we note that Ms. Landwehr appears to claim in this appeal that her neck, shoulder, and upper extremity symptoms, in addition to her headaches, were caused by her original workplace injury, in 1999. However, the issue addressed by the hearing examiner in this case was whether "[Ms.] Landwehr's headaches are related to the lifting injury she suffered on August 6, 1999." As indicated in the discussion below, Dr. Hopfensperger offered no opinion as to the cause of any of the symptoms claimed by Ms. Landwehr other than her headaches. Additionally, we note that Dr. Hopfensperger stated, as early as 2007, that he did not have "anything to offer" Ms. Landwehr with respect to her neck and back pain. Further, Dr. Hopfensperger made no mention of any symptoms in Ms. Landwehr's neck, shoulder, or upper extremities following her last visit with him in April, 2009. Consequently, we confine our review to the issue of whether substantial evidence supports the hearing examiner's determination that Ms. Landwehr's headaches were not causally related to her 1999 workplace injury. We find that the hearing examiner's conclusion is supported by substantial evidence.

[¶16] The hearing examiner recognized that Ms. Landwehr claimed to have experienced different symptoms as a result of her 1999 and 2008 workplace injuries. The hearing examiner noted as follows:

> Landwehr described the headaches she experienced from being struck on the head in Nebraska as intense for six months. Landwehr attempted to differentiate the headaches she experienced in 1999 from those she experienced in 2008. Landwehr testified that in 1999 the headaches were "real severe" but the nausea was not as severe as she experienced in 2008. Landwehr also testified she was not belligerent in 1999.

The hearing examiner, however, determined that Ms. Landwehr was not a credible witness, in part because she had not candidly informed her treatment providers of her medical history:

> In reviewing the extensive documentation submitted in this matter, a number of things concerned this Office. To begin, in reviewing the documents generated by Nurse Cordova in Nebraska beginning January 10, 2008, this Office noted that Landwehr made no mention to her Nebraska health care providers of her claimed work related injury in Wyoming. This was particularly noticeable as Landwehr's complaints in Nebraska related to headaches, neck and shoulder pain along

7

with associated nausea and an aversion to physical therapy. These were the same complaints she voiced for seven years in Wyoming to various health care providers. In addition, this Office noted Landwehr made no mention to her Nebraska health care providers that she was taking Cymbalta throughout her entire course of treatment in Nebraska. Indeed, as noted above, Nurse Cordova's notes consistently related Landwehr's injury in Nebraska to [] headaches related to an on-the-job injury of blunt trauma. Thus, her Nebraska health care providers were kept in the dark concerning Landwehr's claimed injury in Wyoming, despite the noticeably similar symptoms reported by Landwehr to her Wyoming health care providers. . . . Landwehr was trained as a CNA so the failure to inform Nebraska health care providers of her Wyoming claim was glaring. This Office also noted that Landwehr filed her Nebraska worker's compensation claim under the [sur]name of Carter. . . . Thus, this discovery was only made after Landwehr had received months of medical care in Nebraska and had received a monetary settlement of her claim in Nebraska. These concerns are noted as they caused this Office concern about Landwehr's veracity.

Additionally, the hearing examiner noted that Ms. Landwehr stated that she was not experiencing headaches as of her visit to the Sandhills Clinic in May, 2006. Ms. Landwehr gave the following testimony at the contested case hearing:

> Q: What did they prescribe for your headaches at Sand Hills?
>
> A: Um, I didn't have the headaches. I never complained of headaches. My headaches had almost – didn't bother me hardly at all. . . .
>
> Q: So basically your headaches had gotten better before you were hit with the muffin pan?
>
> A: Yes, they had. Yeah.

However, Ms. Landwehr's medical records reveal that she reported having "frequent headaches" during her initial neurologic consultation with Dr. Hopfensperger in September, 2006, and that Dr. Hopfensperger prescribed duloxetine, in part, to treat her headaches.

8

[¶17] As we have previously stated, we give substantial deference to a hearing examiner's credibility findings: "Credibility determinations are the unique province of the hearing examiner, and we eschew re-weighing those conclusions. We defer to the agency's determination of witness credibility unless it is clearly contrary to the overwhelming weight of the evidence." *Willey v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 144, ¶ 20, 288 P.3d 418, 427 (Wyo. 2012) (quoting *Beall v. Sky Blue Enters.*, 2012 WY 38, ¶ 28, 271 P.3d 1022, 1034 (Wyo. 2012)). The evidence contained in the record supports the hearing examiner's finding that Ms. Landwehr failed to provide complete medical histories to various treatment providers and that she did not report consistent symptoms to her treatment providers in Nebraska and Wyoming. Accordingly, we are unable to find that the hearing examiner's determination with respect to Ms. Landwehr's credibility was clearly contrary to the overwhelming weight of the evidence.

[¶18] Additionally, we note that expert medical testimony was necessary to establish causation in this case due to the amount of time that had elapsed since Ms. Landwehr's 1999 workplace injury, the intervening injury in Nebraska in 2008, and the complex nature of Ms. Landwehr's symptoms and medical history.[2] Where expert testimony is necessary to establish causation, we have stated that

> "[T]he causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation or acceleration of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard . . . .
>
> [U]nder either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

---

[2] We have stated that "[i]t is only where injuries are so immediately and directly or naturally and probably the result of an accident, [that] medical evidence is not essential to find a causal connection." *Hampton v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 17, ¶ 14, 296 P.3d 934, 938 (Wyo. 2013) (quoting *Thornberg v. State ex rel. Wyo. Workers' Comp. Div.*, 913 P.2d 863, 867 (Wyo. 1996)). Ms. Landwehr does not dispute the fact that medical expert testimony was necessary to establish causation.

*Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (quoting *Hall*, ¶ 16, 37 P.3d at 378). However, "opinions expressed by medical experts in terms of 'can,' 'could,' or 'possibly' are not sufficient to meet an employee's burden of proof." *Middlemass*, ¶ 28, 259 P.3d at 1168 (quoting *Boyce v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 9, ¶ 21, 105 P.3d 451, 458 (Wyo. 2005)). Further, we have held that a claimant fails "to prove causation when [her] physician testifies causation was 'certainly a possibility,' but could not make an 'authoritative statement.'" *KG Constr., Inc. v. Sherman*, 2005 WY 116, ¶ 15, 120 P.3d 145, 149 (Wyo. 2005) (quoting *Thornberg*, 913 P.2d at 869).

[¶19] The only medical expert who testified in this case was Dr. Hopfensperger. During his deposition, when he was asked "[h]ow much of [Ms. Landwehr's] current symptoms are due to [the 1999 workplace injury] as opposed to other factors," Dr. Hopfensperger stated that "I think that would be pretty speculative." Dr. Hopfensperger subsequently confirmed his opinion, in the following exchange, that a causal relationship between Ms. Landwehr's 1999 injury and her 2010 headaches would be "speculative."

> Q:  And as we sit here today, the cause of the headaches is idiopathic, is that accurate . . . ?
>
> A:  I correlated her headaches with her reporting that they came on after injury in 1999.  The actual cause of the headaches, I think, is idiopathic at this time.
>
> . . .
>
> Q:  Doctor, when you say their cause is idiopathic, tell me what you're inferring.
>
> A:  Maybe a better word, if you don't mind my going back and retracting slightly.  Maybe a better word is that it's an occult cause, so we don't know. . . . In her case she had told me that she did not have the headaches before this 1999 injury, and had the headaches after the 1999 injury.  I felt there was a correlation there.
>
> . . .
>
> Q:  As you stated earlier, the causal relationship is speculative?
>
> A:  Correct.

. . .

Q: It's speculative in what regards?

A: Well, cause versus correlation.

Q: Just [flesh] it out for us. You can see where we're going here.

A: I understand. A patient, she comes in and she says she didn't have headaches before this injury in 1999, and she has headaches afterwards. There was some sort of injury involving the spinal column, which, of course, can often present with symptoms that involve the neck or the head, as the musculature is fairly contiguous, and, therefore, I felt there was correlation. Now, the actual causation I really couldn't say.

Dr. Hopfensperger's testimony that Ms. Landwehr's 2010 symptoms were "idiopathic" and "occult" is not sufficient to establish that Ms. Landwehr's symptoms were more likely than not caused by her 1999 workplace injury. Contrary to Ms. Landwehr's suggestion, there is no evidence in the record indicating that Dr. Hopfensperger opined that her 2010 symptoms were a "direct and continuing consequence" of her 1999 workplace injury.

[¶20] Further, the hearing examiner appropriately discounted the weight of Dr. Hopfensperger's testimony because it was based largely on information provided by Ms. Landwehr, who, as noted above, was found to lack credibility. The hearing examiner further noted that Dr. Hopfensperger did not have medical records relating to (1) Ms. Landwehr's physical therapy following her 1999 injury; (2) the results of Dr. Viola's diagnostic studies; (3) Ms. Landwehr's extensive treatment with Dr. Ribnik; or (4) psychological evaluations indicating that Ms. Landwehr suffered from depression. The hearing examiner concluded that "Because he lacked so much of Landwehr's medical history, Dr. Hopfensperger's opinion based upon the correlation reported to him by Landwehr is given very little weight."

[¶21] We have previously noted that the hearing examiner has the responsibility, as the trier of fact, to determine relevancy, assign probative value, and ascribe the relative weight to be given to the evidence presented. *Anastos*, ¶ 20, 120 P.3d at 666. In weighing medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it. *Id.* We have stated that "The hearing examiner

11

[is] also in the best position to judge the weight to be given to the medical evidence" and "may disregard an expert opinion if he finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based." *Id.* Considering that Dr. Hopfensperger stated that he "couldn't say" whether Ms. Landwehr's 2010 headaches were caused by her 1999 workplace injury, and that this opinion was offered without the benefit of Ms. Landwehr's complete medical history, the hearing examiner's decision to give "very little weight" to Dr. Hopfensperger's testimony is also supported by substantial evidence.

[¶22] In sum, the evidence in this case does not support Ms. Landwehr's claim that the headaches she experienced in 2010 were related to the initial workplace injury to her mid-back. During the 11 years that elapsed since her initial workplace injury, Ms. Landwehr received at least four MRI's, all of which were "unremarkable" and returned no objective evidence of a causal connection between her mid-thoracic strain and her claimed symptoms. Also during this time, Ms. Landwehr was diagnosed with carpal tunnel syndrome and fibromyalgia, both of which provide possible explanations for her upper-extremity symptoms, and there is no evidence in the record to suggest that either of these diseases was related to the initial workplace injury. Most importantly, Dr. Hopfensperger's testimony that the cause of Ms. Landwehr's headaches was "idiopathic" and "occult" provides absolutely no basis to conclude that her headaches were, more probably than not, the result of her initial back injury in 1999, as opposed to the 2008 workplace injury to her head, for which she received a worker's compensation settlement in Nebraska. We find substantial evidence to support the hearing examiner's conclusion that there was no causal connection between Ms. Landwehr's headaches and her 1999 workplace injury.

[¶23] Affirmed.